UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION



Written Opinion

Under the E-Government Act and
Judicial Conference policy

| | |
|---|---|
| CONOPCO, INC. d/b/a/ GOOD HUMOR-BREYERS ICE CREAM, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | CASE NO. 1:08-cv-0349-DFH-JMS |
| ) | |
| MINSTER BANK, HEARTLAND PROCESSING, LLC and G& G MARKETING SERVICES, LLC, ) | |
| ) | |
| Appellees. ) | |

_____

| | |
|---|---|
| MINSTER BANK, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | CASE NO. 1:08-cv-0349-DFH-JMS |
| ) | |
| CONOPCO, INC. d/b/a GOOD HUMOR-BREYERS ICE CREAM, ) | |
| ) | |
| Appellee. ) | |

_____

| | |
|---|---|
| MINSTER BANK, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | CASE NO. 1:07-cv-1572-DFH-JMS |
| ) | |
| HEARTLAND PROCESSING, LLC, ) | |
| ) | |
| Appellee. ) | |

ENTRY ON CROSS-APPEALS FROM BANKRUPTCY COURT

Three different decisions by the United States Bankruptcy Court for the Southern District of Indiana are on appeal in these cases.  Underlying each of them is the bankruptcy court's May 23, 2007 entry granting partial summary judgment for Minster Bank on its cross-claim for proceeds from Heartland's accounts receivable (the "May 23 Entry").  Minster Bank holds a secured interest in the accounts receivable of now-bankrupt Heartland Processing, LLC and G&G Marketing Services, LLC (collectively, "Heartland").  One of those accounts receivable is in the name of Conopco, Inc., which does business as Good Humor-Breyers Ice Cream ("Breyers"), for milk products that Heartland processed and delivered to Breyers.  Breyers refused to pay Heartland's invoices after it learned that Heartland was failing to pay the raw milk producers, who then demanded payment from Breyers.  Rather than paying Heartland's invoices, Breyers paid the producers for the raw milk they had delivered to Heartland for processing for Breyers' ultimate use.  Now, although Breyers has already paid for the milk once, Minster Bank demands that Breyers pay again, to Minster Bank, as the secured lender to Heartland, the bankrupt non-paying middleman in this chain of dairy production.  The bankruptcy court granted Minster Bank's motion for summary judgment, and Breyers appeals.

In turn, Minster Bank appeals from the bankruptcy court's August 20, 2007 order staying enforcement of its May 23 Entry pending Breyers' appeal.  In its order of stay, the bankruptcy court required Breyers to post a letter of credit in an amount of $1,167,765.41 plus one year of post-judgment interest.  Minster Bank

contends that it is also entitled to an award of prejudgment interest by virtue of the May 23 Entry. Minster Bank also moves for leave to appeal from the bankruptcy court's August 20, 2007 entry interpreting and enforcing the contingency fee arrangement between Minster Bank and Heartland. (Case No. 1:07-cv-1572, Dkt. 1.) For reasons explained below, the court reverses the bankruptcy court's entry on Minster Bank's motion for summary judgment. That decision renders moot Minster Bank's appeals on the prejudgment interest issue and interpretation of the contingency fee agreement, so those appeals are dismissed.

I.     *Factual and Procedural Background*

    A.     *Minster Bank's Security Interest*

Because the case was decided on summary judgment, the court construes the record evidence in the late reasonably most favorable to Breyers, giving it the benefit of conflicts in the evidence and reasonable inferences that the evidence might support. In about 1999, the plaintiffs, Heartland and G&G Marketing Services, LLC[1] sought to establish a milk processing operation in Union City, Indiana. To secure the necessary funding, Heartland obtained financing from

---

[1]G&G was engaged in marketing and brokering milk from dairy suppliers to processing and manufacturing facilities. Heartland was engaged in processing, pasteurizing, and condensing milk at the Union City, Indiana processing facility. Pursuant to the terms of the contract with Breyers (described in full below), raw milk was obtained by G&G and processed by Heartland. For all practical purposes, the two companies have been treated as one entity in the proceedings so far, and the court refers to them collectively as "Heartland."

Minster Bank.  In January and April 2000, Heartland executed and delivered promissory notes to Minster Bank in amounts totaling $3,250,000.  As security for these notes, Heartland executed and delivered to Minster Bank security agreements conveying a security interest to Minster Bank in all of Heartland's assets.  In March 2000, G&G executed and delivered to Minster Bank a promissory note for $200,000.  Heartland guaranteed the G&G note.  As security for the note and guaranty, Heartland executed another security agreement conveying to Minster Bank an additional security interest in Heartland's assets.  Minster Bank perfected its security interests in the Heartland security agreements.

The security agreements granted Minster Bank a secured interest in Heartland's assets that included but were not limited to the following:

> All rights [Heartland has now and may have in the future] to the payment of money including, but not limited to:
> (a)    payment for goods or other property sold or leased or for services rendered, whether or not [Heartland] has earned such payment by performance; and
> (b)    rights to payment arising out of all present and future debt instruments, chattel paper and loan and obligations receivable.
>
> The above include any rights and interests (including all liens and security interests) which [Heartland] may have by law or agreement against any account debtor or obligor of [Heartland].

Doc. No. 184.

B.    *The Breyers-Heartland Product Purchase Agreement*

On December 1, 1999, Heartland and Breyers entered into a Product Purchase Agreement ("PPA") to be governed by New York law.  Trost Aff. ¶ 4, Ex. A (PPA).[2]  Under the PPA, Breyers as "BUYER" agreed to purchase "finished product" from Heartland as "SELLER."  PPA ¶ 1.  The PPA specified several types of processed dairy products that Breyers would purchase from Heartland, including cream, whole condensed milk, condensed skim milk, nonfat dry milk, and heat-treated milk.  PPA ¶ 4.  The plaintiffs obtained raw milk from, among other sources, Brewster Dairy, Foremost Farms USA Cooperative, also known as the Mideast Milk Marketing Agency, Inc., and Dean Milk Company, Inc. (collectively, "the producers").  Trost Aff. ¶ 7.  The PPA differentiated between "assigned" and "non-assigned" milk.  "Assigned" milk was "Producer milk assigned to [Breyers] as of November 1998 (consisting of (6) loads per day)."  PPA p. 1. Assigned milk was milk obtained by Heartland from dairy producers.  Trost Aff. ¶ 7.  "Non-assigned" milk included "all other milk directed by [Breyers] outside of [Heartland] and manufactured by [Heartland]."  PPA p. 1.  Non-assigned milk was milk that was bought by Breyers at certain times of the year and directed by Breyers to the facility to be processed.  Trost Dep. 79.

---

[2]Breyers attests that Breyers and the plaintiffs entered into the PPA on January 4, 2000.  Breyers Br. 6.  The PPA was notarized on that date but the operative date of the agreement appears to be December 1, 1999, as asserted by the plaintiffs.  See PPA p.1; Pl. Br. 7.  The court need not resolve this discrepancy on appeal.

Under the PPA, the price Breyers paid Heartland for the processed products manufactured from the milk supplied by the producers had three components: (1) the cost of the raw milk Heartland used in manufacturing the processed product, plus one dollar per one hundred weight ("cwt") of milk above the published price; (2) an administrative fee of thirty cents per cwt of milk; and (3) a processing fee based on the type and amount of processed milk product Breyers was purchasing. PPA ¶¶ 2-4. Specifically, paragraph 3 of the PPA provided "BUYER to pay SELLER $.30 cwt. for all milk processed *or administrated* through SELLER to cover accounting, testing and other costs incurred." PPA ¶ 3 (emphasis added). In their Verified Complaint, the plaintiffs alleged that "the [PPA] contemplated that [Heartland] would administer payments to Assigned Producers and Non-Assigned Producers for the raw milk. For this service, [Heartland] would be entitled to payment of 30 cents per one hundred weight ('cwt') of raw milk." Complaint ¶ 21; see also Plaintiffs' Responses to Amended Second Interrogatories p. 4 ("Pursuant to the Contract, [Heartland] administrated payments to producers."); Miller Dep. 315-16. Jim Gilbert, one of the plaintiffs' owners, testified that the plaintiffs were to pass through payments from Breyers to the raw milk producers. J. Gilbert Dep. 173.

C.  *The Compromise of Lou Miller*

Lou Miller worked as Breyers' purchasing agent in charge of the Heartland accounts. Although Miller was a paid employee of Breyers, in September 1999,

Heartland secretly gave Miller an eighteen percent ownership interest in Heartland.  Miller Dep. 296-97.  Heartland's Gilbert testified that Miller's job was to "see that [Heartland was not] being screwed" and "got the money [it] was supposed to get in the price of the finished product . . . that [Heartland was] getting the money that [Heartland] deserved."  J. Gilbert Dep. 89.  Gilbert testified further that Miller was given the ownership interest in Heartland "so that [Miller] would make sure [Heartland] got what it had coming from [Breyers]."  *Id.* at 89-90.

In addition to the equity interest, Heartland secretly paid Miller $5,000 per month from November 1999 through May 2000.  J. Gilbert Dep. 54-55; Plaintiffs' Responses to Breyers' Second Amended Interrogatories p. 20.  Then, in late November 1999, Breyers employee Lou Miller was even appointed Chairman of Heartland's board of directors.  T. Gilbert Dep. 17-19, Ex. 19; Gaerke Dep. 102-03.  As Chairman, Lou Miller was expected to deal with milk brokers and find additional milk supply for Heartland.  Gaerke Dep. 109-10.  Breyers was unaware that Miller, as its milk buyer, was secretly taking payments from Heartland during the operation of the PPA.  Miller did not inform Breyers of his ownership interest in Heartland until late December 2000, when the relationship between Breyers and Heartland was falling apart.  Trost Aff. ¶ 20; Hau Dep. 123-24.

D.   *Miller's Dealings with the Non-Assigned Suppliers*

In November 1999, after receiving his ownership interest in Heartland, Miller received a letter from Brewster's milk broker, T.C. Jacoby & Company, Inc. ("Jacoby"), regarding Brewster milk that was being directed to Heartland's plant. Miller Dep. 197-99, 297-98, Ex. 21.   Jacoby indicated that Breyers, not the plaintiffs, would be invoiced for the cost of the Brewster milk delivered to the plaintiffs.  Miller Dep. Exs. 21, 39.  Miller did not respond in writing to Jacoby to clarify that the plaintiffs, not Breyers, were responsible for paying Brewster for the raw milk, though he may have responded orally.   Miller Dep. 288-89.

Similarly, Miller advised Foremost on July 28, 2000 that it should submit to Breyers its billing for three loads of raw milk delivered to the Heartland processing facility.  Miller Dep. Ex. 27.  In September 2000, Miller received a letter from Midwest Milk Marketing (successor to Foremost) advising Miller that it would provide "your Heartland location at Union City" with raw milk and requesting payment from Breyers for that delivery.  Miller Dep. Ex. 26.

Miller received a letter from Dean dated October 11, 2000 advising him that Dean would deliver raw milk to the processing facility and that payment was due 10 days from the date of the invoice.  Miller Dep. Ex. 25.  All this time, Miller was acting as Breyers' purchasing agent but had an interest in and was receiving payments from Heartland.

E.      *Heartland Fails to Pay the Producers, Who Seek Recourse from Breyers*

In July 2000, Heartland Vice Chairman Lynn Rickert wrote that Heartland owed Brewster more than $2 million for the months of April, May, and June 2000, explaining: "we put ourselves in this situation by putting all monies received into one account and by doing so we were paying all invoices to get the evaporator up and running, so when it came time to pay the Brewster Dairy billing we fell short of funds." Miller Dep. 338-42, Exs. 43, 69. When Heartland failed to pay, Brewster cut off further milk supplies to Heartland and sought payment from Breyers for the raw milk it had supplied to Heartland. Trost Aff. ¶¶ 10, 11, Exs. B, D. On November 3, 2000, Brewster sued Breyers in the United States District Court for the Eastern District of Missouri to recover $1,158,992.48 that it claimed it was owed for the raw milk it delivered to Heartland. Trost Aff. ¶ 14. Although, as described below, Breyers had received notice from Minster Bank on December 18, 2000 of its interest in Heartland's account receivable from Breyers, Breyers paid Brewster $1,050,000 to settle the Brewster lawsuit on March 18, 2002. *Id.* at ¶ 23. In the settlement agreement, Breyers denied liability to Brewster, and Brewster assigned to Breyers any claim it might have asserted against Heartland. Trost Dep. Ex. F pp. 1, 4.

In the meantime, Breyers learned in the fall of 2000 that Heartland also was not paying Foremost. *Id.* ¶ 13. By December, Foremost also stopped making raw milk shipments to Heartland and was threatening suit against Breyers. *Id.* at ¶ 18. On January 2, 2001, Foremost filed a lawsuit against Breyers in a

Wisconsin state court to recover $416,991.34 for raw milk it had delivered to Heartland but for which it had not received payment from Heartland. *Id.* at ¶ 21; see also Complaint ¶ 32. Although Breyers had received notice from Minster Bank on December 18, 2000 of its security interest, Breyers settled the Foremost litigation in November 2002 for $335,000, again denying liability in the settlement agreement. Trost Aff. ¶ 24, Ex. G p. 1. Also, Foremost assigned to Breyers any claim it might have brought against Heartland. Trost Aff. Ex. G pp. 5-6.

Breyers learned in late 2000 that Heartland also owed Dean $765,759.05 for raw milk Dean had delivered. Trost Aff. ¶ 22. Though Dean was a supplier of milk, it was also a buyer of Breyers' finished dairy products. Dean began deducting amounts that Heartland owed it from Breyers' unrelated invoices until Dean was paid in full. *Id.*; Hau Dep. 149-50. The parties have not clarified whether all, none, or some of those deductions were made prior to Minster Bank's notice to Breyers of its security interest on December 18, 2000, but in any event, Breyers did not challenge Dean's deductions.

An internal Heartland memorandum dated December 14, 2000, reflects that as of that date, the plaintiffs owed $1,148,227 to Brewster, $416,991 to Foremost, and $151,416 to Dean. Key Dep. 85-87, Ex. 14.

Meanwhile, in December 2000, Heartland breached various obligations to Minster Bank under the notes and Heartland's security agreements. Minster

Bank knew that Breyers owed Heartland the sum of $1,167,765.41.   On December 18, 2000, Minster Bank sent Breyers its "Notice to Make Payment to Secured Party."   Minster Bank's Response and Cross Motion for Summary Judgment, Exs. I-L.   Minster Bank provided Breyers with notice of its security interest in "[a]ll rights of [Heartland] to the payment of money . . . ." and demanded immediate payment to Minster Bank.   *Id.*   After receiving this notice, Breyers did not pay Minster Bank for the plaintiffs' open invoices to it.

F.   *The Adversary Proceeding*

In late 2001, Heartland filed a bankruptcy petition, and also filed a multi-count complaint against Breyers, alleging breach of the PPA as well as other claims.   Breyers counterclaimed to recover the amounts it had paid to Heartland's raw milk producers and asserted several defenses, including breach of contract, breach of fiduciary duty, indemnification, and setoff or recoupment.   Minster Bank, also a party to the litigation, filed a cross-claim against Breyers seeking to recover the approximately $1.1 million Breyers had not paid to Heartland. Minster Bank asserted that it was entitled to recover the amount in dispute free and clear of any defenses that Breyers might be in a position to assert against Heartland.

On summary judgment before the bankruptcy court, both Heartland's and Breyers' cross-motions for summary judgment were denied.   However, on May 23,

2007, the bankruptcy court granted Minster Bank's motion for summary judgment on its cross-claim against Breyers, finding that Minster Bank was entitled to recover the approximately $1.1 million that Breyers owed to Heartland's accounts receivable.   The bankruptcy court held that Breyers' obligation to Minster Bank was not subject to any defenses or claims Breyers might have asserted against Heartland.   Breyers has appealed that decision to this court.

In the meantime, the bankruptcy court stayed enforcement of its May 23, 2007 judgment pending Breyers' appeal.   In the bankruptcy court's August 20, 2007 order of stay, it required Breyers to post a letter of credit in the amount of $1,224,519.26, consisting of $1,167,765.41 plus one year of post-judgment interest in the amount of $56,753.85.   Minster Bank appeals that stay, contending that because the amount owed by Breyers is a sum certain, the bank is entitled to an award of prejudgment interest.

Minster Bank also seeks leave to appeal the bankruptcy court's August 20, 2007 entry in which the court found that any recovery by Minster Bank pursuant to the May 23, 2007 summary judgment entry in its favor is subject to payment of Heartland's counsel's expenses and contingent fees as set forth in the parties December 3, 2001 Agreed Entry pertaining to the parties' contingent fee arrangement.   Case No. 1:07-cv-1572, Dkt. 1.

II.   *Standard of Review*

Breyers appeals from the bankruptcy court's conclusions of law that its breach of contract claim and recoupment defense against the plaintiffs did not arise from the PPA between Breyers and Heartland under § 9-318(1)(a) of Indiana's enactment of the Uniform Commercial Code, and that its claims of breach of fiduciary duty and indemnification against Heartland did not accrue until Breyers made payment to Heartland's creditors and thus did not accrue in time to displace Minster Bank's interest for purposes of § 9-318(1)(b).  See generally May 23 Entry Conclusions of Law.  The court has jurisdiction over the parties' appeals from final rulings of the United States Bankruptcy Court of this district pursuant to 28 U.S.C. § 158(a).  The parties agree that the issues presented by Breyers are conclusions of law, so the court applies the *de novo* standard of review.  *In re Krueger*, 192 F.3d 733, 737 (7th Cir. 1999).  In reviewing Breyers' claims, consistent with the well-recognized standard for summary judgment, the court construes all facts and draws all reasonable inferences in favor of Breyers, the non-moving party.  *Freeland v. Enodis Corp.*, — F.3d. —, 2008 WL 4053032, *10 (7th Cir. Sept. 2, 2008); *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005).

In its cross-appeal, Minster Bank contends that the bankruptcy court's order regarding prejudgment interest in its August 20, 2007 stay was error.  It also appeals from the bankruptcy court's August 20, 2007entry interpreting and enforcing the contingency fee arrangement between Minster Bank and Heartland.

Because the court reverses the bankruptcy court's entry on Minster Bank's motion for summary judgment on which both the order of stay and the entry pertaining to the contingency fee arrangement rested, Minster Bank's appeals from these orders are moot.

III.    *Discussion*

    A.    *Claims and Defenses "Arising From" the PPA*

Under Indiana Code § 26-1-9-318(1)(a)(2000)[3], the rights of Minster Bank as the plaintiffs' assignee are subject to "all the terms of the contract between the account debtor [here, Breyers] and assignor [here, the plaintiffs] and *any defense or claim arising therefrom.*" (Emphasis added.)  Relying on *Boatmen's National Bank of St. Louis v. Sears, Roebuck & Co.*, 106 F.3d 227 (8th Cir. 1997), the bankruptcy court found as a matter of law that Breyers' claims of breach of contract and recoupment against the plaintiffs did not arise from the PPA, but instead arose from separate agreements that Breyers made with the unpaid producers.  May 23 Entry Conclusions of Law ¶¶ 5-11.  On appeal, Breyers asserts the bankruptcy court's conclusion was in error.  The court agrees with Breyers.

Only the *source* of Breyers' asserted claims and defenses – and not their merit – is at issue in this appeal.  Minster Bank sought summary judgment on the ground that its rights as a secured creditor are not subject to Breyers' claims and defenses.  See Minster Bank's Cross-Motion for Partial Summary Judgment; see

---

[3]Indiana Code § 26-1-9-318(1) was repealed by section 48 of P. L. 57-2000, effective July 1, 2001, but was operative at the time of the transaction between Heartland and Minster Bank, and thus applies to this case pursuant to Ind. Code § 26-1-9.1-709(a) ("IC 26-1-9, before its repeal, determines the priority of conflicting claims to collateral if the relative priorities of the claims were established before IC 26-1-9.1 takes effect").

also Breyers' Response; Minster Bank's Reply.  Accordingly, in granting Minster Bank's motion, the bankruptcy court ruled on Minster Bank's contention that its priority position as a secured creditor was not affected by Ind. Code § 26-1-9-318(1)(a) because Breyers' claim of breach of contract and recoupment defense did not arise from the PPA between Breyers and the plaintiffs.  As stated by Judge Tinder in an earlier ruling in this case, the *merits* of Breyers' claims or defenses are not at issue before this court in this appeal:

> On appeal from the Minster Bank Judgment, the court need only decide whether to affirm the Bankruptcy Court's determination that, as a matter of law, Breyer's breach of contract/fiduciary duty defenses do not arise from the PPA and may not be asserted against Minster Bank.  This question – whether, as a matter of law, Breyers' defenses do not arise from the PPA – is entirely distinct from the merits question; Breyers' defenses might arise from the PPA and nevertheless fail on the merits.  *If any genuine issue of material fact exists regarding whether Breyers' defenses arise from the PPA, then the Minster Bank Judgment should be reversed, without any need to pass upon the merits of Breyers' defenses.*

*Conopco, Inc. v. Heartland Processing, LLC*, 2007 WL 4580036, *4 (S.D. Ind. Dec. 21, 2007) (emphasis added).  In other words, because this court concludes that Breyers' breach of contract claim and recoupment defense against the plaintiffs arose from the PPA between Breyers and the plaintiffs, this court must reverse the decision of the bankruptcy court without regard to the merits of those same claims and defenses.  The merits of Breyers' asserted contractual claims and defenses are not relevant for purposes of Ind. Code § 26-1-9-318(1)(a), were not relevant to the bankruptcy court's consideration of Minster Bank's motion for summary judgment, and thus are not relevant for purposes of Breyers' appeal.

1.    *Breach of Contract Claim*

To resolve whether Breyers' breach of contract claim arose from the PPA, the court first looks to the case on which the bankruptcy court relied – *Boatmen's National Bank of St. Louis v. Sears, Roebuck & Co.* – for any guidance that case may provide.  In *Boatmen's*, several contracts were at issue.  Boatmen's National Bank took a security interest in the accounts receivable of Boardman's Printing Company ("BPC") in exchange for a revolving line of credit.  BPC defaulted on its loan, and Boatmen's took assignment of BPC's accounts receivable.  At the time of default, Sears owed BPC approximately $900,000 for printing advertising circulars.  Rather than paying that invoice, Sears had paid BPC's paper suppliers. When Boatmen's attempted to collect from Sears, Sears refused to pay, claiming the right to an offset in what it had paid directly to BPC's paper suppliers. *Boatmen's*, 106 F.3d at 228-29.

Up to this point, the facts in *Boatmen's* closely parallel the facts of this case. In *Boatmen's*, one contract existed between BPC and Sears for the printing of the circulars, under which BPC was required to use paper suppliers of Sears' choosing.  The BPC-Sears contract was comparable to the PPA between Breyers and the plaintiffs.  However, the BPC-Sears contract included an indemnification clause under which BPC promised to hold Sears free and harmless from all liabilities incurred by BPC in conducting BPC's business.  *Boatmen's*, 106 F.3d 229-30.  No similar clause was included in the PPA here.  More important, in

*Boatmen's*, Sears also had its own separate agreements, both written and oral, with the paper suppliers.  In those agreements, Sears had agreed, in exchange for a partial rebate of the paper price, to be liable to them if BPC failed to pay them. *Boatmen's,* 106 F.3d 228.  This case has its share of promises outside the PPA, as well, but those were promises and representations made by Lou Miller, Breyers' purchasing agent whose loyalty plaintiffs had compromised.  There was no similar complication in the *Boatmens'* supply chain from the paper suppliers to BPC to Sears.

Ultimately the Eighth Circuit found in *Boatmen's* that Sears could not avoid its obligation to BPC based on its payments to the paper suppliers because Sears' claim against BPC did not arise from its contract with BPC.  The indemnification clause did not impose any liability on Sears to BPC's paper suppliers and did not give BPC or Boatmen's, as BPC's secured creditor, notice of any separate contracts Sears had with the paper suppliers.  *Id.* at 230.

Here, in support of its breach of contract claim, Breyers alleges that the plaintiffs breached the PPA when they failed to fulfill their obligation to "administer" Breyers' payments to the raw milk producers that supplied the plaintiffs.  Breyers Br. 23.  The plaintiffs acknowledged this obligation to administer payments pursuant to the PPA in their complaint, in which they alleged: "the [PPA] contemplated that [Heartland] would administer payments to Assigned Producers and Non-Assigned Producers for the raw milk.  For this

-18-

service, G& G would be entitled to payment of 30 cents per one hundred weight ("cwt") of raw milk . . . ."  Complaint ¶ 21; see also Plaintiffs' Responses to Breyers' Second Amended Interrogatories at 4 ("pursuant to [the PPA], [Heartland] administered payments to producers.")  No one disagrees that the plaintiffs failed to pay the raw milk producers.  And, in the meantime, Breyers was exposed to liability to the producers because Heartland put Lou Miller in a position of compromised loyalty.  Because of Miller's dual position as Breyers' employee and Heartland's part owner and chairman, unlike BPC or its secured creditor in *Boatmen's*, Heartland (and, by extension, Minster Bank) did have notice of the supposed separate "agreements" between Breyers and producers based on Miller's assurances that Breyers would pay if Heartland did not.

And, even if the plaintiffs' operation was merely a "pass-through" for Breyers' payments,[4] under Breyers' version of the evidence, Breyers was damaged by the plaintiffs' failure to accomplish the pass-through.  If the plaintiffs were obligated under the PPA to pass on Breyers' payments to the milk producers, then Breyers was directly exposed to liability by the plaintiffs' failure to do so.  If not, then Breyers was still indirectly exposed to liability by Miller's promises that Breyers would pay on the plaintiffs' behalf.  Under either interpretation of the PPA, Breyers' claim that the plaintiffs breached the PPA arose from the PPA and not,

---

[4]The bankruptcy court has not yet resolved the question under the PPA whether it was Breyers' or the plaintiffs' responsibility to pay for the raw milk.

as the bankruptcy court found, solely from the independent settlement agreements between Breyers and the individual producers.

The plaintiffs' brief focuses on the merits of Breyers' breach of contract claim, which, as set forth above, are not the basis of this court's review.  See Pl. Br. 17-21.  Minster Bank argues, echoing the bankruptcy court's decision, that Breyers' breach of contract claim does not arise from the PPA because Breyers did not pay the producers pursuant to the PPA, but instead paid them pursuant to independent settlement agreements.  Minster Bank Br. 14, 17 ("There is nothing in the PPA that reflects an obligation *on Breyers' part* to pay Heartland's suppliers. The plain language of the PPA simply does not provide for any such obligation." (emphasis in original)).  However, the issue here is not why Breyers paid the producers, but whether it can reasonably be said that the plaintiffs breached the PPA when they failed to administer Breyers' payments to the producers and, through Lou Miller, exposed Breyers to obligations owed to the producers via the PPA.  The bank's reliance on those settlement agreements therefore fails.

Minster Bank also argues that, "like Sears in the *Boatmen's* case," Breyers benefitted from Miller's promises that Breyers would pay the producers' invoices, regardless of Miller's questionable loyalties and motives, so that Miller's behavior cannot be the basis of a breach of the PPA.  According to Minster Bank, it would have been in Breyers' interest to reassure the raw milk producers that they would be paid because, "like any prudent vendor," the raw milk producers would be

hesitant to ship a substantial volume of product to a start-up company like Heartland, and "Breyers could not receive the processed milk which it wanted from Heartland unless Heartland had milk to process."  Minster Bank Br. at 18. In *Boatmen's*, Sears' promises to pay the uncertain vendors were memorialized in written and oral agreements separate from the underlying contract between Sears and BPC, and the loyalty and motives of Sears' agents in entering into these outside agreements were not at issue.  Here, nothing supports the argument other than Minster Bank's speculation that Lou Miller was acting in Breyers' best interest (notwithstanding the evidence from Heartland that it hired Miller to make sure that Heartland got all the money from Breyers that it deserved).

In light of the narrow issue presented by Breyers' appeal, the court cannot conclude as a matter of law that Miller was acting only as an agent for Breyers and not as an agent for the plaintiffs in making these side pacts or assurances that Breyers would pay the producers.  In short, Breyers' claim for breach of contract, whether based on the theory that the plaintiffs were obligated to administer or "pass-through" Breyers' payments to the milk producers, or on the theory that Lou Miller had been effectively bribed and was acting and speaking on behalf of the plaintiffs and to the detriment of Breyers, arose out of the PPA for purposes of section 9-318(1)(a).  The judgment of the bankruptcy court must be reversed and remanded for further proceedings on Breyers' breach of contract defense to Minster Bank's cross-claim.

2.      *Recoupment Defense*

Breyers also argues that its recoupment defense arose under the PPA for purposes of Ind. Code § 26-1-9-318(1)(a).  Under the common law doctrine of recoupment, a defendant can meet a plaintiff's claim with a countervailing claim that arose out of the same transaction as the plaintiff's claim or cause of action for the purpose of abating or reducing such a claim.  See *In re Klingberg Schools*, 68 B.R. 173, 178 (N.D. Ill. 1986), *aff'd*, 837 F.2d 763 (7th Cir. 1988); see also 5 Collier on Bankruptcy ¶ 553.10 (15th ed. rev. 2006).  In bankruptcy, recoupment often serves to "avoid the unjust result that would occur if a debtor who has been overpaid pre-petition by a party in a contract is permitted post-petition to make a claim under the contract against that party without regard to the overpayment it has received."  *In re McMahon*, 129 F.3d 93, 96 (2d Cir. 1997).  Due to the equitable nature of the recoupment doctrine, courts have been reluctant to define the same-transaction standard precisely, and tend to focus instead on the facts and equities of each case.  See *United States v. Dewey Freight System, Inc.*, 31 F.3d 620, 623 (8th Cir. 1994).

Here, the bankruptcy court found that Breyers' recoupment defense did not arise under the PPA, applying what is known as the "single integrated transaction" test.  May 23 Entry Conclusions of Law ¶¶ 16-17.  Breyers contends that the bankruptcy court should have analyzed its defense of recoupment using the "logical relationship test," but that even under the single integrated transaction

test, its recoupment defense arose under the PPA for purposes of § 9-318(1)(a). Because the court concludes the bankruptcy court should have applied the more flexible logical relationship test in this case, the decision of the bankruptcy court is reversed and remanded.

The "logical relationship" test was articulated by the Supreme Court in *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926), in which it stated that the concept of a "'transaction' is a word of flexible meaning.  It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." Under this standard, "courts have permitted a variety of obligations to be recouped against each other, requiring only that the obligations be sufficiently interconnected so that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party."  5 Collier on Bankruptcy at 553.10.  The First, Ninth, and District of Columbia Circuit Courts of Appeals apply this test. *In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 4 (1st Cir. 2004) (applying the logical relationship test and joining the "overwhelming majority" of district and bankruptcy courts on this issue); *In re TLC Hosps., Inc.*, 224 F.3d 1008, 1013-14 (9th Cir. 2000); *United States v. Consumer Health Services of America, Inc.*, 108 F.3d 390, 395 (D.C. Cir. 1997); see also *In re Health Mgmt. Ltd. P'ship*, 336 B.R. 392, 396 (Bankr. C.D. Ill. 2005).

Other courts, led by the Third Circuit, have applied the more restrictive "single integrated transaction test."  Under this approach, outlined in *University Medical Center v. Sullivan*, 973 F.2d 1065, 1081 (3d Cir. 1992), "a mere logical relationship is not enough."  Under this narrow construction, the obligations in question must "arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of the transaction without also meeting its obligations."  *Id.*; see also *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 146 (2d Cir. 2002) (applying single integrated transaction test); *In re Peterson Distributing, Inc.*, 82 F.3d 956, 960-61 (10th Cir. 1996) (same); *United States v. Dewey Freight System, Inc.*, 31 F.3d 620, 623 (8th Cir. 1994) (same).  Under this test, as long as the amount of the relevant obligations sought to be recouped may be "independently determinable," recoupment may be denied.  *University Medical Center*, 973 F.2d at 1081.  But to some extent, corresponding obligations are always "independently determinable." See 5 Collier on Bankruptcy at 553.10.  Because strict application of the "single integrated transaction" test may be used to deny recoupment in virtually every case, the logical relationship test has been said to be the "better" test.  *Id.*

The Seventh Circuit has not expressly adopted a test for recoupment.  In *Kleven v. Household Bank F.S.B.*, 334 F.3d 638 (7th Cir. 2003), the court accepted the bankruptcy court's and district court's use of the "single integrated transaction" test in dictum, but the passing comment does not show that the court was taking sides in the circuit split.  In *Kleven*, the court briefly addressed

the trustee's secondary argument that the Refund Application Loans at issue should be viewed as set-offs rather than recoupments, and mentioned that "the reality of a RAL process . . . is more accurately viewed as a *single integrated transaction.*"   *Kleven*, 334 F.3d at 643 (emphasis added); see also *Warsco v. Houeshold Bank F.S.B.*, 272 B.R. 246, 253 (Bankr. N.D. Ind. 2002) (court below) (distinguishing set-off from recoupment:   "where mutual debts 'arise out of a *single integrated transaction* so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations,' the creditor's apparent offset is really recoupment" (emphasis in original)); *In re Stratman*, 217 B.R. 250, 252 (Bankr. S.D. Ill. 1998) (applying "single integrated transaction" test to recoupment claim); *In re St. Francis Physician Network, Inc.*, 213 B.R. 710, 718-20 (Bankr. N.D. Ill. 1997) (same); *In re CDM Management Services, Inc.*, 226 B.R. 195, 197 (Bankr. S.D. Ind. 1997) (same).   Relying on *Kleven*, the bankruptcy court found that the single integrated transaction test applied here, and, without further analysis, concluded that Breyers' recoupment defense did not arise under the PPA for purposes of section 9-318(1)(a).   The passing comment in *Kleven* cannot be taken as authority for the proposition that the Seventh Circuit was deliberately choosing sides in this circuit-split.   The brief reference did not acknowledge the split or cite the cases on opposite sides of the issue.

The court is mindful of the Seventh Circuit's caution that bankruptcy courts (and, by extension, the district courts reviewing their opinions) should not broadly apply "equitable" concepts.   See *In re Fesco Plastics Corp.*, 996 F.2d 152, 157 (7th

Cir. 1993) (noting that § 105 of the Bankruptcy Code states that a bankruptcy court may exercise its equitable power only as necessary to carry out the provisions of the Code); *In re Lapiana*, 909 F.2d 221, 223-24 (7th Cir. 1990) ("Flexible interpretation designed to allow the judicial interpolation of traditional defenses in a statute silent on defenses is one thing; standardless decision-making in the name of equity is another"). Even so, there are few, if any, textbook commercial transactions in the world, and the logical relationship test offers the flexibility necessary to courts that must attempt to apply, after the fact, principles of equity in determining whether one event was sufficiently tied to another to permit one party to recoup what it is owed from its obligations to another party.

This case illustrates why the single integrated transaction test has limited utility. Breyers' obligation to Heartland and Heartland's obligation to the raw milk producers are "independently determinable" and thus do not satisfy the single integrated transaction test. Yet those obligations are strongly and logically interconnected, and all stemmed from the relationship established and developed pursuant to the PPA and the two commercial hats worn by Lou Miller as a result of Heartland's payments to him. And Breyers may well be able to show on the merits that it was vulnerable to the suppliers' claims, and decided to settle them, precisely because Minster Bank's assignor (Heartland) had corrupted Miller's loyalty and led him to give the suppliers the impression that Breyers would guarantee that they would be paid for any milk supplied to Heartland. Under those circumstances, Breyers would have a substantial claim to equitable

recoupment as a result of the close relationship between the different claims. Again, setting the merits aside and assuming for purposes of Breyers' appeal that its assertions are true, the court finds that the allegations supporting Breyers' claim of recoupment are sufficiently logically connected to one another that they support a conclusion that Breyers' claims and the PPA may be considered a single transaction for purposes of section 9-318(1)(a). Whether the merits of Breyers' allegations will be sufficient to support a recoupment defense is a question to be answered on another day. For now, the decision of the bankruptcy court rejecting Breyers' recoupment defense must be reversed and remanded.

B.   *Accrual of Claims and Defenses under § 9-318(1)(b)*

The next issue is whether Breyers' other claims – breach of fiduciary duty and indemnification – accrued before or after Minster Bank gave notice of its interest on December 18, 2000. Under Indiana Code § 26-1-9-318(1)(b), the rights of Minster Bank as assignee are subject to "any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment." Minster Bank sent its "Notice to Make Payment to Secured Party" to Breyers on December 18, 2000. Minster Bank's Response and Cross Motion for Summary Judgment, Exs. I-L.

Relying on its conclusion, as described above, that the transaction between Breyers and the producers did not stem from the PPA, the bankruptcy court

looked only to the settlement agreements between Breyers and the producers in determining when Breyers' claims and defenses would have accrued for purposes of § 9-318(1)(b). Citing *West Des Moines State Bank v. Brunswick Corp.*, 483 N.W.2d 338 (Iowa App. 1992), the bankruptcy court found that Minster Bank's Notice was sent before Breyers settled with the producers, and thus predated Breyers' acquisition of rights against the plaintiffs by assignment from the producers under the settlement agreements. May 23, 2007 Entry Conclusion of Law ¶¶ 13, 14.[5]

---

[5]The bankruptcy court cited *West Des Moines* for the proposition that for purposes of section 9-318(1)(b), a claim "accrues" for an account debtor (here, Breyers) "when the account debtor actually makes the payment which is the basis for the setoff." May 23 Entry Conclusion of Law ¶ 13. In that case, Mercury Marine owed sales rebates to its dealer, DMBC. *West Des Moines*, 483 N.W.2d at 339-40. When the dealer went bankrupt, a lender, West Bank, sought to enforce its security interest in the rebates owed to DMBC. In the meantime, and after West Bank had given notice of its claim, Mercury Marine paid DMBC's debt owed to a different lender pursuant to a separate agreement and took an assignment from that lender of DMBC's unpaid obligations. *Id.* at 340, 343. Mercury Marine then argued, in defense of West Bank's claim, that it was entitled to offset the debt DMBC owed to the other lender that Mercury Marine had taken by assignment. *Id.* at 340. Because Mercury Marine had not acquired any right of offset prior to receiving West Bank's notice, the court in *West Des Moines* concluded West Bank had priority in the rebate funds. *Id.* at 343.

Here, the fact that Breyers' agreements with Brewster and Foremost included assignments of their rights against Heartland tends to support the bankruptcy court's reliance on *West Des Moines*. However, Breyers is not actually asserting any claim or defense based on the rights of the raw milk producers that it was assigned in the settlement agreements. It asserts its *own* claims – breach of fiduciary duty and indemnification – against the plaintiffs. Its claims are based on plaintiffs' conduct, not Breyers' settlement agreements with the producers. The question for the court therefore is whether these claims accrued before or after Minster Bank provided notice on December 18, 2000. *West Des Moines* offers little guidance in that regard. Nor, for that matter, does *Chemical Bank v. Penny Plate, Inc.*, 365 A.2d 945, 949-50 (N. J. Super. 1976), as that case dealt not with section 9-318(1)(b) (as Minster Bank asserts in its brief) but with section 9-318(3) – and,

(continued...)

The bankruptcy court did not address whether Breyers' other claims and defenses that it has asserted against the plaintiffs – breach of fiduciary duty and indemnification – accrued before or after Minster Bank sent its Notice, finding that question to be irrelevant.  May 23, 2007 Entry Conclusion of Law ¶ 19.  This court respectfully disagrees and concludes that the issue is both relevant and critical under Indiana Code § 26-1-9-318(1)(b).

1.     *Accrual of Breyers' Breach of Fiduciary Duty Claim*

As with Breyers' breach of contract claims, the *merits* of Breyers' breach of fiduciary duty claim are not yet at issue, as Judge Tinder explained.  See *Conopco*, 2007 WL 4580036, *5 (S.D. Ind. Dec. 21, 2007) ("If a genuine issue of material fact exists regarding the accrual of a defense prior to receipt of this notice, then the court may reverse the grant of summary judgment without passing upon the merits of Breyers' claims against Heartland.").  The essence of Breyers' breach of fiduciary duty claim is Breyers' contention that the plaintiffs were to act to Breyers' benefit as Breyers' agents by "administering" payments to the raw milk producers.  Breyers Br. 15.  Whether that actually was the case is an issue for another day.  For purposes of this appeal, the court assumes that the plaintiffs owed Breyers a fiduciary duty to administer those payments, and that the

---

[5](...continued)
in any event, in *Chemical Bank* summary judgment in favor of the secured lender was reversed.  See Minster Bank Br. at 19-20.

plaintiffs breached that duty.  The only question before this court is when such a claim accrued for purposes of Indiana Code § 26-1-9-318(1)(b).

Under New York Law, which governed the PPA, a cause of action for breach of fiduciary duty accrues upon the occurrence of the alleged wrongful conduct. *Savino v. Lloyds TSB Bank, PLC*, 499 F. Supp. 2d 306, 312 (W.D. N.Y. 2007); *Kaufman v. Cohen*, 307 A.D.2d113, 121 n.3 (N.Y. App. Div. 2003); accord 4 James J. White & Robert S. Summers, Uniform Commercial Code § 34-5 (4th ed. 1995) (a claim or defense accrues under section 318(1)(b) when it would give rise to a cause of action).  Again, assuming that the plaintiffs owed Breyers a duty as fiduciaries, the wrongful conduct occurred when the plaintiffs diverted money owed to the producers to plaintiffs' own expansion projects and failed to pay the producers on Breyers' behalf.  The parties do not dispute that the plaintiffs had failed to pay Brewster as of July 2000, Foremost as of October 2000, and Dean as of early December 2000.  In each instance, then, Breyers' breach of fiduciary claim accrued prior to Minster Bank's December 18, 2000 notice.  Under Indiana Code § 26-1-9-318(1)(b), Minster Bank's rights are subject to Breyers' breach of fiduciary duty claim against the plaintiffs.  The bankruptcy court's May 23 Entry holding otherwise must be reversed and remanded.

2.    *Accrual of Breyers' Indemnification Claim*

Under New York law, the right to implied or common law indemnification arises in favor of one who is compelled to pay for another's wrong.  See *Board of Managers of Bay Club Condominium v. Bay Club of Long Beach,* 827 N.Y.S.2d 855, 861 (N. Y. Sup. 2007).  In the "classic" common law indemnity case, "the one entitled to indemnity from another had committed no wrong, but by virtue of some relationship with the tort-feasor or obligation imposed by law, was nevertheless held liable to the injured party."  *D'Ambrosio v. City of New York*, 435 N.E.2d 366, 368 (N.Y. 1982) (concerning common law contribution rights among joint tort-feasors).  Breyers alleges that it has a claim of indemnity against the plaintiffs, and that its claim accrued for section 9-318(1)(b) purposes prior to Minster Bank's December 18, 2000 notice.  As with Breyers' other arguments on appeal, the merits of Breyers' indemnification claim are not yet relevant.  The court's only focus is to determine when the indemnification claim would have accrued for purposes of section 9-318(1)(b).

Under New York law, a party need not wait until it has suffered an actual loss (here, Breyers' settlements with and payments to the raw milk producers) before asserting a claim for indemnification. See *Gomez v. Preferred Rentals*, 1997 WL 749389, *9, n.9 (S.D.N.Y. Dec. 3, 1997).  "The fact that the statute of limitations does not begin to run until the underlying claim is resolved does not mean that a defendant should be precluded, prior to that time, from obtaining a conditional judgment on a claim for indemnification."  *Id.*  If Breyers had been sued by the plaintiffs the day before Minster Bank's December 18, 2000 Notice,

it could have asserted its indemnification claim against them because Breyers had already been exposed to liability to third parties – the producers – as of that date. For purposes of section 9-318(1)(b), then, Breyers' indemnification claim had accrued upon the occurrence of the events for which it sought indemnification. See *Seymour v. Victor Balata Belting Co.*, 665 N.Y.S.2d 1010, 1011 (N.Y. Sup. 1997) ("It is true that the right to indemnification, either statutory or contractual, accrues only upon a judgment in the main action.  But the right to such indemnification crystallizes at the time of the occurrence, and appellate courts have uniformly recognized that in such cases an action for a conditional judgment of indemnification is not premature.").

Again, whether or not Breyers' indemnification claim has merit was not a question before the bankruptcy court on Minster Bank's motion for summary judgment, nor is it a question before this court on Breyers' appeal.  The only issue is whether Breyers' indemnification claim accrued prior to December 18, 2000 for purposes of Ind. Code § 26-1-9-318(1)(b).  Under New York law, it did.  The bankruptcy court's entry therefore must be reversed.

*Conclusion*

When stated in the simplest of terms, this appeal is about whether Breyers is entitled to assert its defenses that, because of the wrongdoing of another, it should be required to pay once more for the milk that was processed but never

paid for by Heartland.  This question may look different once full light has been shed on the merits of Breyers' claims and defenses, but so long as the question is only whether Breyers should have opportunity to air those claims and defenses, the answer under both section 9-318(1)(a) and (b) is yes.  The decision of the bankruptcy court granting summary judgment for Minster Bank on its cross-claim against Breyers is reversed and remanded for further proceedings to resolve the merits of Breyers' defenses.  Minster Bank's appeals from the bankruptcy court's orders of August 20, 2007 are both dismissed as moot.

So ordered.

Date:  September 26, 2008

_David F. Hamilton_

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Alicia Mitchell Chandler
KRIEG DEVAULT LLP
achandler@kdlegal.com,pdidandeh@kdlegal.com

Ryan Michael Hurley
BAKER & DANIELS LLP
ryan.hurley@bakerd.com,doublehoosier@yahoo.com

Jon Laramore
BAKER & DANIELS LLP
jon.laramore@bakerd.com

Libby Yin Mote
KRIEG DEVAULT LLP
lmote@kdlegal.com

James E. Rossow , Jr
RUBIN & LEVIN, PC
jim@rubin-levin.net,susan@rubin-levin.net

Michael A. Staudt
FAULKNER GARMHAUSEN KEISTER & SHENK
mstaudt@fgks-law.com,cfisher@fgks-law.com

Mark R. Wenzel
KRIEG DEVAULT LLP
mwenzel@kdlegal.com,pdidandeh@kdlegal.com

Joseph H. Yeager , Jr
BAKER & DANIELS LLP
jhyeager@bakerd.com,khagan@bakerd.com,jsdavis@bakerd.com

Thomas P. Yoder
BARRETT & MCNAGNY LLP
tpy@barrettlaw.com